**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FORD MOTOR COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Case No. 99-121C<br>(Judge Merow) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY**

Charles J. Cooper
Counsel of Record
Cooper & Kirk, PLLC
1500 K Street, N.W.
Suite 200
Washington, D.C. 20005
(202) 220-9600

Of Counsel:

Michael W. Kirk
Vincent J. Colatriano
Nicholas A. Oldham
Cooper & Kirk, PLLC
1500 K Street, N.W., Suite 200
Washington, D.C. 20005
(202) 220-9600

August 19, 2005

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .......... ii

BACKGROUND .......... 1

ARGUMENT .......... 8

A. The Alleged Deficiencies In Ford's Claim Do Not Justify The Discovery Sought By The Government .......... 9

B. The "Remittance Evidence" Issue .......... 13

C. The Site Exchange Agreement .......... 16

CONCLUSION .......... 17

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Delco Elecs. Corp. v. United States*, 17 Cl. Ct. 302 (1989) ................................................ 14, 15

*Doninger Metal Prods., Corp. v. United States*, 50 Fed. Cl. 110 (2001) ................................. 15

*Propellex Corp. v. Brownlee*, 342 F.3d 1335 (Fed. Cir. 2003) ............................................ 14-15

*Zoltek Corp. v. United States*, 61 Fed. Cl. 12 (2004) ............................................................... 16

Plaintiff Ford Motor Company ("Ford") respectfully submits this opposition to Defendant's Motion for Discovery ("Motion"). In its Motion, the Government misapprehends applicable law (to the extremely limited extent the Government even bothers to refer to relevant law) and mischaracterizes the facts relating to the costs for which Ford is seeking reimbursement in this action. Equally important, if not more important, the Government fails to fully inform the Court of the substantial amount of informal discovery it has already taken from Ford and the voluminous information that has been made available to it by Ford. Perhaps most remarkably, the Government does not even mention that Ford had offered to provide the Government *additional* discovery – indeed, Ford had made clear to the Government that it was prepared to agree to most of the additional discovery that the Government had suggested to Ford it needed. Rather than agree or even respond to Ford's proposal, however, the Government chose to burden this Court with a meritless, and wholly unnecessary, request for even more discovery than it had earlier indicated that it needed. Not only is the Government's Motion without merit, it seems calculated to needlessly impose burdens on Ford and to delay the resolution of a case that could and should have been resolved months ago. The Motion should be denied.

## BACKGROUND

The Government has had the vast bulk of the figures relating to Ford's damages claim since 1999, when Ford filed its summary judgment motion. In that motion, Ford spelled out in considerable detail the three categories of costs for which it sought reimbursement, with interest, under its contract with the Government: (1) payments by Ford to lawyers (the law firm of Dickinson Wright) and independent experts and consultants for services rendered in connection with proceedings involving the Willow Run site; (2) payments by Ford to the Willow Run Trust Fund that were allocable to Ford's performance of its contract with the Government; and (3) payments

by Ford to another company, IT Corporation, that were allocable to Ford's performance under the contract. Ford's summary judgment submission included schedules of the costs incurred up to that time, as well as witness declarations and other materials describing the calculation of Ford's damages claim.

Following remand of this action by the Court of Appeals, this Court entered an order dated January 19, 2005 ("January Order") establishing an informal procedure by which Ford would provide, and the Government would have the opportunity to examine, information relating to Ford's claim for damages. The January Order required Ford to provide to Government counsel by February 21, 2005 "schedule(s) or summary(ies) of all amounts claimed," along with certain supporting materials. Upon receipt of such schedules/summaries, the Government was to "promptly . . . provide for a complete examination or audit of the source material" and was to provide a detailed response to Ford's claim within sixty days. January Order at 3.

Ford satisfied its obligations under the Order. On February 21, it supplied to the Government "Plaintiff's Statement of Claimed Costs And Supporting Schedules" ("Statement") (appended as Attachment 1). The Statement consisted of a detailed 5-page narrative discussion of the costs for which Ford was entitled to reimbursement, as well as more than 32 pages of attachments, which included three witness declarations and numerous schedules documenting Ford's claimed costs. Many of the supporting materials included in the Statement had in fact been produced to the Government in 1999, when Ford had filed its summary judgment motion. In accordance with the January Order, the Statement also included descriptions of the sources for the items and figures listed in the provided materials, as well as listings of the names and addresses of the persons who prepared relevant schedules and the persons whom Ford would make available to the Government's auditors in order to provide additional information. On several occa-

sions since initially providing the Government with its Statement, Ford has informed the Government of relatively minor corrections to and updates of its claim for reimbursement of costs.

Although the January Order required the Government to "promptly" provide for an audit, it took Government auditors until March 14 -- nearly a month after receiving the Statement -- to even contact Ford about interviewing the persons identified in the Statement. Notwithstanding the Government's delay, in late April, Ford agreed to the Government's request for an additional 30 days to complete its audit. Since being contacted by the Defense Contract Audit Agency ("DCAA") in mid-March, Ford has gone to extraordinary lengths to accommodate the DCAA's requests for information. Among other things, Ford (1) has made its counsel and outside attorneys available for multiple in-person and telephone interviews by the DCAA auditor[1]; (2) has made available to the DCAA numerous boxes of source materials (including countless invoices, ledgers, and other accounting records) supporting the costs described in the Statement[2]; and (3) responded to numerous requests for additional information. The files that Ford made available to the Government included detailed invoices relating to the costs for which Ford seeks reimbursement, and also included, in many cases, other types of direct evidence of Ford's payment of those costs. For example, the files made available to the Government included numerous copies of checks (albeit non-cancelled checks) issued by Ford, ledgers evidencing issuance and receipt

---

[1] Three of the persons identified in Ford's Statement – Kathy Hofer, Sharon Newlon, and Margaret Coughlin – have *each* met separately with the DCAA auditor on at least two occasions. In fact, Ms. Newlon has met with the DCAA auditor on at least four occasions, and Ms. Newlon, as well as Ford's counsel in this action, have spoken to the auditor by telephone on multiple occasions.

[2] In addition to making these documents available for the DCAA's inspection on multiple occasions, Ford has also offered, on multiple occasions, to provide the DCAA's auditor with copies or scanned images of any non-privileged documents he selected. The DCAA has taken Ford up on that offer with respect to numerous documents.

of Ford payments, and deposit slips evidencing deposits of Ford payments to the Willow Run Trust Fund.

Moreover, Ford worked with the Government to respond to its requests for additional information. For example, in response to inquiries about the allocation of costs between Ford and General Motors ("GM") with respect to the Willow Run site, Ford approached GM and obtained a limited release from confidentiality obligations that allowed Ford to provide the Government with copies of confidential cost allocation documents. Ford personnel also responded to numerous follow-up questions and requests for information by DCAA auditors. In short, Ford devoted considerable resources to working with the DCAA in a good faith effort to provide the Government with the information it needs to assess Ford's claim.

It soon became apparent, however, that regardless of the amount of information Ford provided to the Government, the Government would contend that it was not enough. In particular, notwithstanding the voluminous evidence of Ford's payment of the costs at issue that Ford provided to the Government, the Government began to insist that Ford also provide so-called "remittance evidence" relating to those payments -- *i.e.*, cancelled checks and/or bank statements. Ford has explained to the DCAA on multiple occasions, however, that it was highly unlikely that cancelled checks and bank statements relating to many of the payments at issue had been retained, that it would be unduly burdensome for Ford to track down any existing cancelled checks and bank statements for hundreds of payments made over the course of a multi-year period, and that such "remittance evidence" was simply unnecessary in light of the significant volume of reliable and admissible evidence (*e.g.*, accounting ledgers kept in the normal course of business) relating to these payments that Ford had already made available to the DCAA. The Government nevertheless continued to insist that it be provided with such remittance evidence.

In a status report filed on June 10, 2005, the Government informed the Court that it needed additional discovery. In that status report, which was prepared *after* the DCAA had completed its audit report, the Government justified its request for discovery by noting that the "core remaining disagreement between the parties is whether Ford should be obligated to produce direct proof of its payment of the claimed costs, such as cancelled checks or bank statements." Joint Status Report ("JSR") at 6 (filed June 10, 2005). The Government indicated that it needed to propound RCFC 34 document requests for such evidence, and that it also needed to take a single RCFC 30(b)(6) deposition of Ford. *Id*.[3] In the same Joint Status Report, Ford outlined at length why the Government was not entitled to any additional discovery, either generally or with respect to the so-called "remittance evidence" issue. JSR at 2-5.

In response to the parties' status reports, this Court entered an order dated June 17, 2005 ("June Order"). In its June Order, the Court noted that if it was the Government's legal position that Ford's cost evidence, "absent cancelled checks and bank statements, does not establish recoverable cost, [the Government's] need for discovery of this material at this time to support its case, is questionable." The Court went on to note, however, that if the Government's audit activity had raised "reasonable questions as to the nature of plaintiff's accounting system," certain limited additional discovery "could be justified." To that end, the Court ordered that the parties confer with a view toward reaching agreement on a pre-trial schedule as well as on a procedure whereby Ford could possibly produce enough remittance evidence "to permit reasonable verifi-

[3] Strikingly, in its Motion, the Government seeks to expand the amount of discovery it desires to take, arguing that it should be allowed to take as many as five depositions and to propound interrogatories as well as document requests. Motion at 6. The Government never even attempts to explain why it now needs more discovery than it indicated it needed in its June 10 filing.

cation activity by defendant, at least on a sampling basis, and so limit or obviate any need for the discovery defendant seeks prior to trial." June Order at 2.

On June 29, 2005, the Government sent Ford a letter (appended as Attachment 2) purporting to constitute the Government's effort to "confer" regarding a possible discovery agreement pursuant to the Court's June 17 Order. In this letter, the Government indicated that it needed three and only three categories of additional discovery:

(1) "An unredacted copy of the August 15, 2001 Site Exchange Agreement between Ford and" GM;

(2) "Access, for sampling, to true copies of direct evidence, with probative value equal to or greater than that of bank statements, of" claimed payments by Ford to Dickinson Wright, IT Corporation and the Willow Run Trust Fund and reimbursements paid to Ford with respect to such payment; and

(3) "Sworn responses by a knowledgeable witness or witnesses, in a format to be discussed, to questions concerning" five specified topics.

With respect to this third item, Government counsel subsequently informed Ford's counsel that the Government had quite deliberately decided not to insist on an opportunity to conduct depositions, but rather would be willing to agree to a procedure whereby it would receive sworn responses to written questions.

Following receipt of the Government's June 29 letter, Ford gave serious consideration to the Government's proposal and further investigated its ability to provide the Government with the types of information requested. The parties engaged in a series of discussions regarding discovery-related issues, which culminated in a proposal by Ford pursuant to which Ford agreed to most, though admittedly not all, of the discovery requested by the Government. In particular, on the afternoon of Monday, July 25, counsel for Ford responded as follows to the Government's June 29 three-part discovery proposal:

(1) Because of confidentiality obligations that it owed to GM, Ford was not in a position to agree to the release of the unredacted Site Exchange Agreement. Ford represented to the Government, however, that none of the materials redacted from the copy of the Site Exchange Agreement previously provided to the Government bore upon costs related to the Willow Run site for which Ford was seeking reimbursement. Rather, the redacted materials all related to costs of and activities at sites other than the Willow Run site, including sites at which there were still ongoing clean-up activities. Ford's counsel thus made clear that the redacted material was irrelevant to the issues in this case, and would add nothing to information previously disclosed to the Government regarding the proper allocation percentage by which Ford's costs were to be attributed to its work under the Willow Run contract.[4]

(2) With respect to the "remittance evidence" issue, while Ford indicated that it would be extremely difficult, if not impossible, to track down cancelled checks solely on the basis of the payment schedules previously provided to the Government (which schedules for the most part did not identify the payments by check number or account number), Ford would be willing to undertake the substantial effort necessary to track down cancelled checks with respect to a reasonable sample of payments for which Ford had already provided the Government copies of non-cancelled checks. Ford indicated, however, that, as it had previously informed the Government, it did not believe it had retained copies of cancelled checks for payments predating 1997 or 1998.

(3) With respect to the Government's request for sworn responses to additional questions, Ford indicated that it was prepared to agree to provide sworn written responses to written questions about all of the topics identified in the Government's June 29 letter. In short, Ford agreed to the Government's request with respect to this item in its entirety.

Government counsel responded to Ford's discovery proposal by indicating that he would need to consult with his client, and would thereafter get back to counsel for Ford. Contrary to this representation, however, only a few short hours after receiving Ford's proposal, and without in any way responding to that proposal or offering any counterproposal, the Government filed the present Motion, in which it seeks discovery ranging potentially far beyond, in scope and

---

[4] *See also* Attachment 3 (June 7, 2005 e-mail from S. Newlon to DCAA) ("I have redacted [from the Site Exchange Agreement] only information identifying *other sites* which were involved in the settlement and costs associated with them. *All references to the Willow Run site, including the calculation of future operations and maintenance costs, are included in full.*") (emphasis added).

magnitude, the discovery it had indicated it needed in previous court filings and in its June 29 letter to Ford.

**ARGUMENT**

What is perhaps most striking about the Government's Motion is the extent to which it is unnecessary. The Government does not acknowledge (but nor does it dispute) that Ford has made available to it numerous boxes of supporting materials relating to Ford's claimed costs, and that it has reviewed hundreds of documents pertaining to those costs on multiple occasions. Nor does the Government acknowledge (or dispute) that Ford has made knowledgeable persons available to it to answer any questions it might have about Ford's damages claim, or that Government auditors took full advantage of that opportunity, conducting multiple (and in many cases repetitive) in-person and telephone interviews of each of those witnesses. Thus, the Government has taken advantage of numerous opportunities to ask questions about all of the substantive topics discussed in the Motion.

But the Government's Motion is also unnecessary in another, and even more troubling, respect. As our background discussion demonstrates, notwithstanding all of the informal, audit-related discovery Ford had provided to the Government – pursuant to procedures that, as this Court noted in its June Order, it had crafted in order to "obviate or reduce the need for formal discovery" -- Ford had in fact *agreed* to provide the Government with all of the formal discovery that this Court contemplated in its June Order and substantially all of the formal discovery that the Government had requested in its June 29 letter. June Order at 1. Thus, as suggested by the June Order, Ford proposed a procedure whereby the Government would be provided a sample of copies of cancelled checks relating to payments at issue. In addition to this proposal, which also substantially comported with the second of the three categories of discovery that the Government

requested in its June 29 letter,[5] Ford also indicated to the Government that it was prepared to agree, virtually in its entirety, to its third request – *i.e.*, for sworn responses to Government questions on a variety of topics. Rather than accept Ford's proposal to give it almost everything that it asked for, or even further discuss or respond to that proposal, the Government instead moved the goal line, rushing to Court to demand more discovery than it had indicated in either its prior filings or its June 29 letter that it needed.

Given this history, one could be excused for concluding that, notwithstanding the Government's protestations to the contrary, it is more interested in posturing and tactical maneuvering than in genuinely seeking to fairly and expeditiously resolve a case that has been pending for more than five years. The Court should not reward the Government by allowing discovery that is unnecessary and unduly burdensome and that would delay the resolution of this action.

### A. The Alleged Deficiencies In Ford's Claim Do Not Justify The Discovery Sought By The Government.

The Government seeks to support its claimed need for discovery by pointing to several alleged deficiencies in Ford's claim for costs. Motion at 2-5. The short, and complete, answers to the Government's criticisms are that (1) the Government has had multiple opportunities, of which it has taken full advantage, to ask questions about and seek additional information concerning most if not all of these alleged deficiencies; and (2) Ford offered to provide sworn responses to any additional questions the Government had with respect to these issues. Thus, the issues raised by the Government cannot possibly justify the additional discovery that it now

[5] As discussed above and further discussed below, the only respects in which Ford's proposal did not conform to the Government's request were (1) Ford's recognition that it could not agree to provide copies of cancelled checks for payments made before 1997 or 1998, since Ford did not retain copies of cancelled checks from such periods; and (2) Ford's proposal to track down copies of cancelled checks only for payments for which Ford had already provided the Government copies of non-cancelled checks.

seeks. In any event, the criticisms raised by the Government betray, at best, a misunderstanding of, and, at worst, a mischaracterization of, Ford's damages claim.

Thus, with respect to Ford's claim for reimbursement of payments made to Dickinson Wright, the Government ignores the fact that Ford has provided the Government with Ford's schedules showing that payments had been made and Dickinson Wright schedules showing that the payments had been received. The Government points to the fact that Dickinson Wright recorded some invoices as being "uncollectible," but ignores the fact that Ford is not seeking reimbursement with respect to any such invoices. The Government also points to an alleged "inconsistency" between Ford's Statement, which indicates that Ford has excluded nearly $70,000 from its claim for fees, and one of the supporting schedules, which appears to indicate a reduction of only $34,000. Motion at 3. The Government ignores, however, that this "inconsistency" works, if anything, in the Government's favor, since Ford has made clear to the Government on multiple occasions that its claim for reimbursement is premised upon the larger deduction. And while the Government claims a need to depose the witnesses upon whom Ford relies in allocating Dickinson Wright's fees to Ford's performance under this contract, the Government ignores that its auditors have already interviewed that witness on multiple occasions, and that Ford agreed to the Government's request to provide sworn answers to any additional questions it might have with respect to this allocation issue.

With respect to Ford's claim for payments to IT Corporation, the Government fares no better. It is simply untrue that Ford has provided "<u>no</u> basis to segregate or allocate" the costs paid to IT Corporation by Ford and by GM. Motion at 3. Rather, Ford has provided witness declarations and numerous documents, including an arbitrator's allocation decision and supporting schedules and agreements, which show precisely the basis upon which such allocations were

made. The Government also ignores that Ford provided the Government with a schedule showing *Ford's* (as opposed to GM's) payments to IT Corporation. *See* Attachment 4 (May 25, 2005 e-mail from S. Newlon to DCAA). The Government also ignores the fact that Ford is not seeking reimbursement for the "double recorded" Payment Certificate number 27; in any event, the Government does not explain why it would need discovery regarding this issue, particularly since the "double payment" was clearly credited against subsequently invoiced amounts.

Perhaps most outrageously, the Government implies that Ford has not credited against its claim a $4.5 million reimbursement by GM of an earlier Ford "overpayment" to IT Corporation. This is a red herring, pure and simple. As Ford has explained to the Government on multiple occasions, and as the materials provided by Ford to the Government establish, Ford and GM began making payments to IT Corporation (and to the Willow Run Trust Fund) before a final decision was made regarding the proper allocation of costs between Ford and GM. However, as the Government well knows, once a final allocation decision was made, Ford and GM established a process by which their respective responsibilities and payments were reconciled. It was pursuant to this reconciliation process that earlier Ford "overpayments" to IT Corporation and the Trust Fund were credited to Ford. Once that reimbursement was taken into account, Ford's total payments to IT Corporation corresponded to its total obligations for clean-up costs under the allocation decision. The important point, for present purposes, is that Ford's claim for reimbursement from the Government is based upon the final allocation decision (which the Government does not dispute), and is thus *already* reflective of the reconciliation of previous "overpayments," including the $4.5 million reimbursement by GM.

For similar reasons, the Government's observation that GM reimbursed Ford for more than $2.5 million in overpayments made by Ford to the Willow Run Trust Fund is also a red her-

ring. Motion at 4. That reimbursement was pursuant to the very same reconciliation process that applied to Ford's and GM's payments to IT Corporation. Therefore, for the same reasons that Ford's claim for reimbursement of payments to IT Corporation is already net of any GM reimbursements made through the reconciliation process, so is Ford's claim for reimbursement of payments made to the Trust Fund. The Government clearly knows this, or at the very least should have known this, on the basis of the information it has already obtained from Ford and the interviews it has already conducted.[6]

The Government suggests that it was able to "substantiate[ ]" $1.3 million of payments by Ford to the Trust Fund, Motion at 4, thereby suggesting that it was not able to "substantiate" the remainder of Ford's payments. Though the Government does not explain what it means by its reference to "substantiation," it is apparently referring to the fact that Ford has not provided it with copies of cancelled checks relating to Ford's payments to the Trust Fund. But what the Government does not disclose is that Ford has produced other types of evidence relating to payments to the trust fund, including trust fund ledgers evidencing such payments, copies of some non-cancelled checks, and copies of Dickinson Wright deposit slips relating to some of the payments. Unless the Government is suggesting that such evidence was manufactured or somehow otherwise created for nefarious purposes, not only by Ford but also by the nationally respected law firm of Dickinson Wright, the Government's suggestion that it has not been able to "substantiate" such payments rings incredibly hollow indeed.

---

[6] Indeed, with respect to both its claim for payments to IT Corporation and its claim for payments to the Trust Fund, Ford was upfront with the Government about this reconciliation process and the associated reimbursements; the reconciliation process and related adjustments were disclosed in Ford's Statement, and were discussed at length with Government auditors. *See*, *e.g.*, Declaration of Sharon R. Newlon ¶¶ 8-9 (Attachment C1 to Attachment 1).

**B. <u>The "Remittance Evidence" Issue</u>.**

This brings us to the general issue of Ford's failure to produce cancelled checks or bank statements relating to the payments for which it seeks reimbursement. The Government is very careful not to *directly* state that the discovery its Motion seeks is focused on such remittance evidence. For good reason: The Court made clear in its June Order that the Government was entitled, at most, to a reasonable sample of cancelled checks, and Ford had made clear to the Government in response to its June 29 letter that it was prepared to agree to provide such a sample. But the Government's failure to explicitly acknowledge that the central focus of its discovery effort relates to this issue should not mislead the Court; the history of the audit process and the Government's complaints about its inability to "substantiate" Ford's payments leaves little doubt that that is exactly what the Government is after. But the Government is not entitled to require Ford to undertake the extraordinary burden of tracking down and producing copies of payment evidence that is simply unnecessary in light of the voluminous payment evidence that Ford has already produced to the Government.[7]

As an initial matter, in the normal course of business and in accordance with its record retention policies, Ford has not retained copies of cancelled checks relating to payments that predate 1997 or 1998.[8] Moreover, with respect to payments made subsequent to 1996 or 1997, it would be extraordinarily difficult for Ford to track down copies of cancelled checks solely on the

---

7 The information discussed in text pertaining to Ford's ability to produce remittance evidence is based on discussions with knowledgeable Ford personnel. Because of scheduling conflicts, we have not been able to procure affidavits from such personnel. Should the Court desire such affidavit(s), Ford can submit them promptly.

8 While the Government has in the past referred to a desire to obtain "bank statements" from Ford, any such statements would not contain the detailed payment information the Government apparently desires. The bank statements would therefore be of little value to the Government in its supposed effort to "substantiate" Ford's payments. Moreover, because any such statements are maintained in India, it would be quite burdensome for Ford to track down and produce statements relating to the payments at issue.

basis of the payment schedules Ford has provided to the Government, since those schedules, for the most part, do not identify the payments with references to check or account numbers. It would be theoretically possible for Ford to locate copies of cancelled checks with respect to those payments for which Ford has already provided the Government with copies of non-cancelled checks, since the materials provided to the Government would include identifying information such as check and account numbers. Even in that event, however, producing the copies of cancelled checks would be an extraordinarily burdensome task, as such copies of cancelled checks are buried in voluminous archived files. Ford would therefore need to first identify the file in which a copy of the cancelled check could be located and then search through that file to locate and print out the copy. This process would need to be repeated for every check requested. Such an undertaking would be quite burdensome under any circumstance, but it would be unduly burdensome in this case, given the fact that Ford has already produced to the Government more than adequate evidence of payment of the costs at issue.[9]

In these circumstances, the law simply does not require Ford to expend considerable time and resources and subject itself to such unreasonable burdens. Courts have recognized various methods of proving costs. *See Delco Elecs. Corp. v. United States*, 17 Cl. Ct. 302, 321 (1989). "A contractor must prove its costs using the best evidence *available under the circumstances*. The preferred method is through the submission of actual cost data." *Id.* (citing *Cen-Vi-Ro of Texas, Inc. v. United States*, 210 Ct. Cl. 684, 685 (1976) (table) (emphasis added)); *see also Pro-*

---

[9] Ford has recently learned that there may be a way to discover check numbers even for payments with respect to which Ford has not already provided copies of non-cancelled checks, and to thereby locate copies of cancelled checks from 1997 or 1998 forward. This effort, however, would involve inquiries to Ford's accounting services located in India. Since the Government already has in its possession a reasonable number of non-cancelled checks from the post-1997 period, it would be unduly burdensome to require Ford to also resort to this process to attempt to locate copies of cancelled checks with respect to which the check numbers are not already known.

*pellex Corp. v. Brownlee*, 342 F.3d 1335, 1338-39 (Fed. Cir. 2003). Logically, this method requires the contractor to provide the court with "specific documentation" of its expenses. *Doninger Metal Prods., Corp. v. United States*, 50 Fed. Cl. 110, 125 (2001).

Ford has provided the actual cost data necessary to prove its costs: it has provided documents such as invoices, ledgers, deposit slips, copies of checks issued by Ford, and payment schedules. More to the point, Ford has provided the records on which it intends to rely at trial to prove its damages. While the Government cites to *Delco*, that case simply has no bearing on whether Ford must provide remittance evidence such as cancelled checks and bank statements. In *Delco*, the government and contractor agreed that the contractor was entitled to an equitable adjustment, but disagreed as to the amount of the adjustment. *Delco*, 17 Cl. Ct. at 320. The dispute focused primarily on whether the costs for which the contractor sought an adjustment were reasonable. *Id.* The court did not address the issue presented here, *i.e.*, whether a government contractor must provide remittance evidence that is duplicative of the actual cost evidence it has already provided and on which it intends to rely at trial. Because Ford has provided actual cost evidence sufficient to supports its quantum of damages, it should not be required to undertaken the unduly burdensome task of producing cancelled checks and bank statements that are duplicative of the documents already produced.

Indeed, the Court's rules provide for limiting discovery in precisely this situation. RCFC 26(b) provides, in relevant part:

> The frequency or extent of use of . . . discovery . . . shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery **. . .** to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit . . .

Ford has provided actual cost data that adequately substantiate its costs. With respect to the Dickinson Wright payments, for example, it provided Ford schedules showing that a payment was made and the ledgers from the law firm showing that the payments were received. Any remittance evidence such as cancelled checks and bank statements would therefore be both unreasonably cumulative and duplicative of this evidence. *See, e.g.*, *Zoltek Corp. v. United States*, 61 Fed. Cl. 12, 19-20 (2004) (holding that the third party "need not comply with a 30(b)(6) subpoena to the extent that the subpoena seeks information duplicative of that already provided by the Government").[10]

**C. <u>The Site Exchange Agreement</u>.**

Finally, the Government complains about Ford's failure to produce an unredacted copy of the GM-Ford Site Exchange Agreement. The Government goes so far as to ascribe sinister motives to Ford for seeking to withhold the unredacted agreement from the Government. Motion at 5 n.1. But, as Ford has explained to the Government, Ford regards the document as a confidential agreement between Ford and GM. Moreover, and most significantly, as Ford has also explained to the Government on multiple occasions, the only materials redacted from the agreement relate to sites other than the Willow Run site; none of the redacted material affects in any way Ford's obligation for, or payment of, costs for which it seeks reimbursement from the Government in this action.[11] In short, the redacted material is both confidential and is irrelevant to the matters raised in this action.[12]

---

[10] Notably, the Government's insistence that Ford provide this type of "remittance evidence" is inconsistent with the fact that in Ford's experience, the Government never provides evidence such as cancelled checks or similar documentation when it sends bills to potentially responsible parties seeking reimbursement of government "oversight" costs under federal environmental statutes.

[11] The Government suggests that the reconciliation process referenced in the Site Exchange Agreement affected Ford's obligations and payments to Dickinson Wright as well as to IT Cor-

## CONCLUSION

For the foregoing reasons, the Government is not entitled to *any* of the discovery it seeks in its Motion. The damages issues remaining to be resolved in this case are not complex. Ford has already provided the Government with voluminous information relating to those claims, and the additional formal discovery sought by the Government is unnecessary and duplicative and will cause undue burden to Ford.

However, should the Court conclude that the Government is entitled to discovery, it should limit any discovery to, at most, the additional discovery that Ford had told the Government it would be willing to provide in response to the Government's June 29 letter. This limited discovery should be more than enough to satisfy any legitimate concerns the Government may have, since it constitutes the vast bulk of the discovery that *the Government itself* suggested it needed in its June 29 letter. In the event that the Court orders discovery along these lines, it should, in order to minimize any further delay in trial preparations, incorporate any such discovery provisions into a pretrial scheduling order. Thus, while Ford believes and respectfully requests that the Government's Motion should be denied in its entirety, if the Court disagrees, Ford respectfully suggests that the Court authorize discovery along the lines outlined below:

(1) On or before September 2, 2005, Defendant may submit to Plaintiff a request for Plaintiff to produce copies of cancelled checks relating to a limited sample of payments made by Plaintiff with respect to which Plaintiff is seeking reimbursement

---

poration and the Trust Fund. Motion at 4. This is incorrect, as the reconciliation had nothing to do with Ford's payments to its own lawyers.

[12] Should the Court so desire, Ford is prepared to submit both the redacted and the unredacted versions of the Site Exchange Agreement to the Court for its *in camera* review. Moreover, in the event that the Court decides that Ford needs to produce an unredacted version of the agreement to the Government, Ford requests that the Court issue a protective order insuring that the agreement can be used solely for purposes of this litigation and may not be publicly disclosed.

from Defendant in this action. Such a request is to be limited to payments with respect to which Plaintiff has already produced to Defendant copies of non-cancelled checks. Upon receipt of such a request, Plaintiff is to undertake diligent and reasonable efforts to locate and produce, within 30 days of receipt of the request, the copies of cancelled checks relating to the payments that are the subject of the request.

(2) On or before September 2, 2005, Defendant may serve upon Plaintiff up to 25 written questions or interrogatories pertaining to Plaintiff's damages claims in this action. Within 30 days of receipt of such written questions or interrogatories, Plaintiff shall provide written, sworn responses to such questions or interrogatories.

(3) On or before October 14, 2005, the parties are to conduct the meeting of counsel and make the exchanges contemplated by RCFC Appendix A ¶ 13.

(4) On or before October 28, 2005, Plaintiff is to file its Memorandum of Contentions of Fact and Law pursuant to RCFC Appendix A ¶ 14 and the submissions required under RCFC Appendix A, ¶¶ 15-16.

(5) On or before November 30, 2005, Defendant is to file its Memorandum of Contentions of Fact and Law pursuant to RCFC Appendix A ¶ 14 and the submissions required under RCFC Appendix A, ¶¶ 15-16.

Finally, any discovery ordered by the Court should not be one-sided. Thus, to the extent that the Court authorizes any discovery of Ford by the Government, it should also make clear that Ford is entitled to take the same types of discovery of the Government.[13]

---

[13] The Government argues in the alternative that "fairness dictates that [it] be allowed to depose anyone whom Ford may present as a witness at trial." Motion at 6. This request should be denied for the reasons discussed herein, but once again, if the Court allows the Government to depose Ford's trial witnesses, "fairness dictates" that Ford also be allowed to depose the Government's trial witnesses.

Respectfully submitted,

s/ Charles J. Cooper________
Charles J. Cooper
Counsel of Record

Of Counsel:

Michael W. Kirk
Vincent J. Colatriano
Cooper & Kirk, PLLC
1500 K Street, N.W., Suite 200
Washington, D.C. 20005
(202) 220-9600

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that, pursuant to the Court's Electronic Case Management System, the foregoing document was served electronically by the court upon the following on this 19th day of August, 2005:

Kyle Chadwick, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn.: Classification Unit, 8th Floor
Washington, D.C. 20530

s/ Charles J. Cooper________